three cases to be submitted today on oral argument beginning with United States v. Morrison Mr. Nassar Thank you, your honors. If it pleases the court, my name is Tony Nassar and I represent appellant Jaclyn Morrison. I stand here before you today because my client was denied her a fair trial and most egregiously to testify effectively on her own behalf in court. These circumstances along with the four other independent grounds detailed in the briefs warrant a new trial in front of a new judge in which Ms. Morrison has afforded her constitutional guaranteed rights. Moreover, it is in the interest of public policy and the best interest of the court. Mr. Nassar You know how rare it is, even if we were to agree with you on a new trial, you know how rare it is to be assigned to a different judge that almost has to be egregious misconduct on the part of the judge. Are you sure you really want to make that request? I mean, to me it undermines the credibility of your case, but you're entitled to make the argument if you really think the standard is satisfied. Mr. Nassar Well, I'd like to make two independent arguments, if I may, your honor. First, that her testimony was arbitrarily limited and that alone warrants a new trial. I ask for a new trial in front of a new judge, your honor, because another independent ground that I asserted was that Judge McBride appeared impartial in this criminal trial, and that is an objective analysis. Mr. McNerney You mean appeared partial? Mr. Nassar Yes, your honor. I apologize. I misspoke. He appeared partial in this trial, and that is an objective analysis, your honor. It does not matter whether he subjectively was partial or not. It only matters what a reasonable person, cognizant of all the circumstances in the case, would think. In this situation, Judge McBride's actions really mirror a case from the Sixth Circuit in which they did order a new trial, Lyle v. Renico. And in that case, Judge interrupted the defense approximately 40 times over six days, took over cross-examination to elicit information not revealed on direct, verbally insulted defense counsel in front of the jury, and only interrupted the prosecution relatively a small number of times to assist it. I believe that that's similar to this situation. For example, during Ms. Morrison's testimony, which was only allowed one hour and 50 minutes to testify on direct, Judge McBride interrupted her 23 times. These do not include objections, your honor, that were raised by prosecution. This does not include evidence being admitted into the record. This does not include questions or statements from either counsel. So while Lyle v. Renico was concerned that over six days, there were 40 interruptions, in less than two hours there were 23, your honor. And not only in the defense, but in the accused's direct testimony. Additionally, Judge McBride- On the issue of limiting the time of her testimony, he didn't impose some arbitrary time limit. He asked counsel, how long is it going to take? What do you think you need? And largely deferred to that, so presumably if counsel had said, well I need four hours, he would have given more time than he did. So I mean, isn't it really an issue of trial counsel misjudging the time that was needed? Judge McBride- I don't believe Ms. Morrison should be punished for the mistake of her counsel. While assistance of counsel, however expert, is only an assistant. That does not impair the fundamental constitutional right to testify on your own behalf in your own criminal trial, your honor. Furthermore, if the- Judge McBride- But we've generally approved of reasonable time limits, and those, you're emphasizing that she was testifying in her own defense, which of course someone has the right to do, and that's important. But you have a constitutional right to confront witnesses, any witness. So really any time limit which we said is allowed is going to somewhat interfere with those constitutional rights. But we've said if it's reasonable, it's allowed. So how do you get around that? Judge McBride- I think it's important to understand the theory of the defense here, your honor. Ms. Morrison, unlike the prosecution which presented 22 witnesses to support the 17 counts brought against Ms. Morrison, Ms. Morrison was meeting those 17 counts and those 22 witnesses almost entirely through her direct testimony. That was how the defense intended to present their defense. There were only seven other witnesses besides Ms. Morrison to briefly speak on her behalf. Thus, there was no other witnesses to meet the charges brought against Ms. Morrison, and that's why the limitation on Ms. Morrison's testimony was not reasonable in this situation. Moreover, you mentioned earlier that- Judge McBride- Well, the testimony in that line, at the end of the two hours, Judge McBride asked counsel if he wanted to make a proffer of her remaining testimony, and he declined to do so. He said, I've got too many pages of notes to make a proffer now. As I understand it, you were not trial counsel. Judge McBride- No, sir. Judge McBride- And she had a federal public defender at trial, Mr. Fleury. Judge McBride- Yes, sir. Judge McBride- All right. And my question is, how can we even review how much time she could have or should have needed in the light of the fact that a proffer wasn't made? Judge McBride- Well- Judge McBride- Until two weeks after trial. Judge McBride- Yes, Your Honor. That time limit, again, was something that I think would be a mistake of the defense counsel that Ms. Morrison should not be punished for. Again, her right belongs to her. The right of the accused, or the right to confront each witness belongs to the accused, not her defense counsel. Judge McBride- Well, she has a right to pick her lawyer. I don't know why she had to have a federal public defender at trial, and now she apparently, and she has retained counsel now, but that's neither here nor there. You know, you're bound by the decisions of your counsel as far as on a direct appeal. Along that line, for the failure to make a proffer of what her testimony should be, what do you consider the standard of review to be for that? Judge Fleury- I still assert that it's the Chapman Harmless Error Analysis because we're talking about a constitutional violation, Your Honor. Judge McBride- How can we judge what her testimony would have been when we don't know, other than something submitted two weeks after trial? Judge Fleury- Well, I don't see that two-week time period necessarily being a debilitating factor to the credibility of that proffer, Your Honor. Judge McBride- Well, the whole point of the proffer is so the judge can have a contemporaneous understanding of what the person wants to testify about. Judge Fleury- Yes, Your Honor, and that was not given, but nonetheless, even taking a step back, just looking at what she was not able to testify at the trial, we can determine what that proffer would have contained, Your Honor. Looking at the 17 charges, the 22 witnesses, specifically the six witnesses that were former clients of Jacqueline Morrison that had the fraudulent, allegedly fraudulent tax returns, Ms. Morrison was not able to speak on how she trained her employees and the training she received, which directly rebutts counts 1-7, 1-14, Your Honor. She did not talk about the returns that she prepared personally. As the two undercover shoppers testified, Jacqueline Morrison nor Gladstone Morrison were involved in the preparation of the tax returns. Moreover, one of the six witnesses that was the only government support for counts, excuse me, Your Honor, I believe counts 9 and 10 testified that Jacqueline Morrison was not involved in the preparation of her tax return. So whether or not she prepared the returns is of crucial importance. Third, Your Honor, Jacqueline Morrison was not able to testify and discuss why the amounts in the Schedule C's were appropriate given the circumstances. Just because a low-income taxpayer has Schedule C losses does not necessarily mean that that is fraudulent, and Jacqueline Morrison was going to try and explain that to the jury, Your Honors. What on this claim suppression of evidence, flesh that out a little bit. Yes, sir. It wasn't raised at trial, was it? It was raised after trial, Your Honor. Again, because of the public defender. However, I would like to flesh that out. Specifically, as I mentioned, there were six witnesses that formed the entire basis for counts 2 through 14 against Ms. Morrison. Three of these witnesses, I believe, were factually discredited. Not the credibility, I shouldn't say discredited, factually impeached, Your Honor. Specifically, Stephanie Brown said Ms. Morrison never prepared her tax return. Rosalyn McFadden said she filed Schedule C's before she went with JMA, which directly controverts the fact that she said she didn't know what they were. And these grounds warrant new trial. All right, you saved time for rebuttal. Thank you. Thank you, Your Honors. Ms. Alamantis. May it please the Court. My name is Tiffany Alamantis, and I represent the appellate, Gladstone Morrison. With the Court's permission . . . New trial counsel? No, Your Honor. I was not. Did Mr. Morrison have a federal public defender's trial counsel? He had CJA, a court-appointed counsel, Your Honor. CJA, not federal public defender. Right, but he had appointed counsel. That's correct, Your Honor. And you're appointed here on appeal. That's also correct. But a different appointed counsel. That is correct. I'd like to focus the majority of my time on two issues. One, the insufficiency of the evidence used to convict Mr. Morrison on counts 1 through 15. And then with regard to 15, the Court taking on a prosecutorial role in aiding the government to present sufficient evidence on that count. Now, as I understand it, the husband—just to make it simple, we'll refer to husband and wife— the husband prepared forms for the Schedule C's? That's correct, Your Honor. Now, you say he prepared forms because, of course, the IRS provides the forms for Schedule C, etc. So what sort of forms are we talking about? Well, I think if I may clarify, it's that he prepared forms that, after the tax returns were prepared for the clients, they reviewed the returns that would be filed and then signed— I guess you could refer to them as attestation forms— asserting that they had reviewed the information, that the information provided was correct. So it's not the Schedule C that he prepared. And, in fact, in counts 3 through 12, for those five taxpayers, each testified that Gladstone Morrison—they never met with him. He didn't prepare their returns. They never saw him directing anyone else in the office with regards to their returns. It's that he had a role in preparing forms that the business used. Well, when you say he prepared a form, was it just a blanket form and people filled in the blanks, or would he sit down with the clients and go over the Schedule C and then the attestation they had to sign? That he prepared the forms like an office policy. I created this form that we will use with our clients. Not that he sat down with each client. And, as I mentioned, with counts 3 through 12, those five taxpayers, in fact, said the opposite, that they never met with him in any regard. His name was not on their files in any regard. Transitioning to counts 13 and 14 involving Stephanie Brown, the only taxpayer out of the five I just discussed and the two undercover IRS shoppers that testified that Gladstone had anything to do with the preparation of her return. Again, this court won't overturn its efficiency based on the credibility of that witness, but I think it's worth pointing out whether a rational jury could have found counts 13 and 14 against Mr. Morrison in light of the fact that Ms. Brown signed those same forms saying she had reviewed the information and that it was correct, but more importantly, that after she left JMA, she continued to file even larger Schedule C losses. So, moving then to count 15. Oh, I'm sorry. Along the lines of your knowledge of the trial, did you review the record for this trial? Yes, Your Honor. Did you help prepare the brief for Gladstone Morrison? Yes, Your Honor. Your name doesn't appear on the brief. A Philip Gregory appears and he signed the brief. Did you? Right, Your Honor, if I could clarify. The initial brief was filed by trial counsel, CJA-appointed trial counsel who stayed on through the appeal. Mr. Gregory, I believe, then took a position with the State of Texas and filed a motion to withdraw. I was then appointed and given the opportunity to review the record, confer with my client, and decide whether to file my own brief, rely on that brief, and then I also filed a motion to file, because by the time I was appointed, reply brief deadline had passed, to file my own reply brief, which I did. So my name appears on the reply brief and I have filed a letter relying on the initial brief. Moving to count 15, it's the first of the wire count charges in counts 15 through 18, and it has to do with a wire transfer from H&R Block to JMA. H&R Block employee Paul Hawkins testified that the fund, the wire originated from H&R's headquarters and or bank in Kansas City. Omni American Bank employee Mary Ray testified, that's JMA's account holder, that they're located in Fort Worth, I believe. It was at this point, after those two witnesses, that the court asked, or out of the presence of the jury, advised the government and the defense counsel that he did not believe that the government has satisfied the element of interstate commerce with regards to that transfer, and the government ultimately decides to recall Paul Hawkins to ask him further questions about the locations. So we submit that even upon recall, the evidence is still insufficient to support the interstate element of that wire fraud charge. Of course, the government takes the position that it sufficiently proved it before the recall. Correct, Your Honor, and I think if you look at Mary Ray, who's actually looking at the details of the wire transfer, she notes that the actual bank that made the wire transfer was Wachovia Bank. It was H&R, presumably H&R in Kansas City, who either authorized it or said, we're going to make this transfer, but it's Wachovia Bank that actually makes the transfer to Omni American, and there's nothing in the record about Wachovia Bank's location. Neither Paul Hawkins nor Mary Ray, even on recall, could address that, and I see my time is up, so if there are no other questions, I'll reserve for rebuttal. Yes, you have saved time for rebuttal. Thank you. Thank you, Your Honor. Ms. Tomiton? May it please the Court, I'll start with Ms. Morrison's claim that her testimony was arbitrarily limited. Judge Barksdale, you're correct that Judge McBride tried to work with defense counsel, and I want to just say to start, you know, defense counsel is good. He is experienced. He knows what he's doing, but it was, he had gotten through a lot of his testimony, and I think he wanted to do more, but he had hit all of the high points. Possibly that's why he had trouble explaining to the judge what he needed to cover at the end. Judge McBride was willing to let him have an opportunity, but because the defense counsel couldn't really offer anything, and in fact, on appeal, another defense counsel is really unable to offer anything substantive that would have been covered if she had been allowed to continue to testify. This is really a pretty simple issue that he did not arbitrarily limit her testimony. The defense was simple. The defense by both Ms. and Mr. Morrison was very simple. The clients fed them the numbers to put on the tax returns, and they didn't knowingly put false information on those returns. They just believed what the clients told them, and she said that. She said that a few times, and so did Mr. Morrison. And in relation to the idea that Ms. Morrison needed more time and couldn't put out her defense adequately without more time, Mr. Morrison only testified for 30 minutes. That wasn't because Judge McBride limited his testimony. He did not. He asked Mr. Morrison's counsel, totally different counsel, how much time do you need, and that defense counsel said 30 minutes, and he did not go over that time. And so if Mr. Morrison, who was also charged in 17 counts, like Mrs. Morrison, if he only needed 30 minutes, then clearly it was adequate for Ms. Morrison to use almost two hours. And really the only reason that her directive went that long is because she gave run-on answers. And that leads me to my second point. I want to ask you about the scheduling of times for witnesses. Was this done pre-trial, some sort of conference, how much time are you going to need for each witness? How did that evolve? No, Your Honor, it appeared that Judge McBride was just seeing how the pace of the trial progressed, and the government did not spend much time on its witnesses, but it did spend more time at the beginning on its witnesses. And so midway through putting on the clients, Judge McBride told the prosecutor, you need to cut out some of this because it's too repetitive. You're talking about the same forms, which seem to be the same for each client, so you don't need to read each form each time. And so he was even telling the prosecutor, shorten it, even though the directs weren't going that long. And so he was quite generous compared to how much time the government witnesses got in giving Ms. Morrison so much time. And as I said in the brief, he based it explicitly on what the defense counsel estimated that he would need. And if you want to look at the defense counsel's redirect, which the prosecutor took, I believe it was a half an hour to cross Ms. Morrison, so not a lot of time to damage her direct testimony. But, of course, the defense counsel was allowed to address anything that the government brought up on cross-examination, and the defense counsel didn't take up that much time. And so the fact is there's nothing in the record to show anything substantial that Ms. Morrison would have testified to if she were given more time. So in terms of the idea that the judge acted partial, as I explained in the brief, the standards on this are basically you look at the totality of what happened at trial, and you ask, was the jury given the impression that the judge was basically a surrogate prosecutor? Was he partial to the government? And there are several reasons that I outlined in my brief for why that's simply not true. And those reasons are that— I thought this was out of the presence of the jury. Exactly. So it's a different point, though, but it's a fairly serious one, which is whether the judge is trying to tell a party, you haven't proved enough, here's what you need to do, because that, abstractly at least, would indicate some degree of trying to help one side over the other. So, yes, Your Honor, there are two prongs of this argument that the defendants put forth. One is just a general argument that he was impartial based in part on things he said in front of the jury and things he said out of the jury's presence. The second prong is one that's raised by Mr. Gladstone and not Ms. Gladstone, and that is the wire fraud issue. So I'll address that first. In terms of did the judge help the government establish wire fraud, as you've noted, there are two answers to that. First, if you look at the conversation that occurred at the bench, which I think both briefs have a description of what happened, it was more a clarifying conversation. It wasn't one where the judge was saying, I think you need to add more. He was just trying to understand what the evidence was. And, of course, we understand why that is. It's because he knew he was going to have to decide a motion for Judge McBride at the end of the trial. And the judge did a really good job of keeping up with all the evidence in this case, but he was confused on exactly what the testimony had been, so he was talking with counsel outside of the jury's presence about it. And the prosecutor was reminding him, no, actually, Mr. Hawkins testified that the wire came from H&R Block Bank Services in Kansas City, and Judge McBride was like, well, okay, I think maybe, but maybe not. He didn't know. The prosecutor thought he had sufficiently established it, and we talk about that in the brief for why he had. But in an abundance of caution, the prosecutor did, based on that conversation, go ahead and recall Mr. Hawkins to talk about it again, but it wasn't an instruction from the judge to do that. And one of the reasons that we know that this wasn't some act of blatant partiality is because defense counsel never objected, never objected to this conversation or what occurred at the time. And that's why I say in the brief that plain error of view applies. And that is one of the things that's really fatal to Mr. Morrison's claim on this, is that not only has he failed to show any clear or obvious error, because I have found no case in which something like this has happened and a court has found it error. Objection is kind of futile, though, right? I mean, the judge has already said, by the way, I think you need to prove this element you haven't proved. I mean, the point is he's helping the government. Whether you object after that or not, the damage is done. Well, I mean, it matters in terms of the standard of review, but it also matters in terms of what Judge McBride can do in terms of explaining himself. Like, this is why I'm asking you this. I'm not trying to help the government. I'm trying to do it because I can't quite recall the previous testimony on this. A judge is allowed to try and analyze and understand the evidence. And in my brief, I cite the authority. Manchac is one of the cases I cite, and it says the judge is allowed to comment on the evidence. And it doesn't restrict that to outside of the jury's presence. And so I'm not saying the judge did this in front of the jury, and I think it's better that he did it outside of the jury's presence, and that's why he called a bench conference. But a judge is allowed to do that, and that's really all that he did was just try to understand the evidence. That is a big difference, as I understand it, between federal practice and Texas state court practice where judges aren't allowed to make comments on the evidence. The judges have a lot of leeway, and I've cited two prior cases where the district court used very similar practices in terms of control of the trial that occurred here, Gray and Mazzell, and I talk about that in terms of was the judge partial here. And the judge, in general, aside from the wire fraud issue, which I just addressed, but just more generally in terms of how he treated the parties, treated them very similarly. And I outline, I cite cases, and really the only thing that the defense or the appellants can say in response to that is, oh, well, he was really trying to help you by asking some more questions to government witnesses. But I went back and I looked, and he asked clarifying questions to defense witnesses. He helped the defense attorney reword questions to make it more clear for the witnesses that he was examining. He cut off some government witnesses' statements. Basically, the judge is very concerned with efficiency and with getting things right, and he likes to kind of show the attorney's best practices, and that's what happened here. And it was the same district court at issue in Gray and Mazzell, and the court there, the appellate court there, found a panel. The circuit found in both cases that that was permissible, and he was really not doing anything that he hadn't done in those cases. Would you please shift now to addressing the sufficiency on counts 3 through 12 as to Mr. Morrison? To me, that's a substantial issue, and I don't really see that the government has tied him factually to those counts, which I believe is the test or at least one of the tests that we apply. So I focused in my brief mostly on the facts that we showed, and those, of course, you've reviewed them, are on Pages 28 through 33 of my brief. I want to highlight just a few of them. One is that he was the COO of the tax agency. He created the protocol. He created the way in which the system worked, and he created, as was mentioned previously, the forms that were used. One of the forms that was used was an assumption of liability that was mentioned previously, and is extremely exculpatory. I'm looking for a word, but basically it is saying, what it's coming out to saying is even if we committed fraud, it's your fault. He put that there, and that was used for all of these taxpayers. Before I get to the law on the circuit, I want to talk about the jury instruction, because that was not challenged on appeal. The jury instruction included an aiding and abetting instruction. That instruction is on— Why didn't you ask for a—because I think a lot of the evidence you cite goes to the conspiracy charge, but then there's the substantive counts that Judge Smith asked about. Why didn't the government ask for a Pinkerton charge? Because that might have brought in all the substantive counts, but I didn't see it in the instruction. It wasn't, and I don't know the answer to that question, Your Honor. Basically, the government's theory was that the conspiracy was the agreement to carry out this fraud, but the individual tax returns that were fraudulent were the overt acts that supported the conspiracy, and the ones that were charged, the tax returns that were charged, were completed only by Ms. Morrison or Mr. Morrison. I think one of the defense counsels said that Ms. Morrison didn't do two of the tax returns that were in Counts 9 and 10, and that's actually—that is not true. In fact, Governments Exhibit 44 and 46 show her name on those returns as the tax preparer. That was Rosalynn McFadden's returns. Do you agree that under this record there was no specific tie of Mr. Morrison to Counts 3 through 12? The tie was in the scheme, and it was in not just the scheme. So the answer to my question is no, there was no evidence. He did not help prepare these returns, but the law in the circuit does not require that, and I want to emphasize that. And the law in this circuit holds, even without an aiding and abetting instruction, for a 7206 subsection 2 conviction, all that needs to happen is that a defendant—well, I will read to you from a case that I'm happy to submit as a 28-J letter, because I was rereading the law on this when I was preparing for this return. And the case—I'll cite it now, but I will submit a letter on this—is United States v. Clark, 577 F. 3rd, 273. The pen cite is 285. It says the statute requires only that a defendant aid or assist in or procure, counsel or advise the preparation of a false return. That statute relies on a theory of liability akin to complicity. It criminalizes an act that facilitates another person's crime when the act is undertaken willfully and with knowledge of the circumstances that make the other person's act illegal. And then this is the critical sentence. Liability under this section is not limited to return preparers. The statute reaches all knowing participants in the fraud. And that's for a substantive 7206. But that kind of begs the question of participant, really. How did he participate? He participated by creating the system, creating the forms, and also there's evidence in the record that he was one of the people who showed the employees how to do this, and that comes from Vernal J. Haney. I cited that in my brief. Mr. Haney was so confused when he took over the company as to why all his employees were creating fraudulent Schedule Cs, and he discovered that that came from Jackie and Gladstone. That's his quote, Jackie and Gladstone, not just Jackie, Jackie and Gladstone. And we know that Mr. Gladstone understood that because he himself created some of these fraudulent tax returns. He created Stephanie Brown's returns, which are charged in counts 13 and 14, and he did the same thing that Ms. Morrison did in these other counts. And so it's really clear that the way in which he participated in the overall scheme and that caused these returns to be able to be prepared also allows him to be held liable for substantive 7206 counts, not just for the conspiracy. That would have been true even if there had been returns long after he had left the company, under your theory, because he had set up the system, is that right? Yes, Your Honor, it would be. As long as someone that I think was related to him or had learned from the system or was using his forms or the protocol was, yes, was related to him. Yes, Your Honor. Was there any evidence about the standard operating procedure at this firm? Because I understand he's not an accountant. Right. Was there any evidence about how, for example, he and his wife would review the type of Schedule C claims made each day or each week or each month? Was there any evidence about how their income increased during this period of the charged conspiracy and substantive offenses that would supposedly allow a reasonable person to know that something illegal was ongoing? Well, they knew because of their client list, and that was something they both knew of. In fact, they bragged about it during the trial. The client list had 5,000 clients on it, and they grew that in a very short amount of time. And then, of course, we know later from the other people who tried to take the company over that that was because these defendants were committing fraud and their whole operation was committing fraud. There's also a flowchart that Mr. Morrison himself created, and that was talked about during the trial. That is Government Exhibit 67. He created that flowchart, and what it talks about is right up at the front, it talks about what documents that the return preparers need to look at, and they included Schedule C documents, like you need to look at the Schedule Cs. They even mention in a footnote in the flowchart that it's good to give them the prior version of their Schedule C to look at. So he created the system. There's also a roster that was found in the kitchen of the Morrisons' house. That included right at the top of that employee roster Gladstone Morrison, Jacqueline Morrison. That is Government Exhibit 192. So it was their scheme together. They perpetrated this scheme. They both profited from it. We know that that enabled Mr. Morrison to negotiate a contract with Express Tax for $750,000 to sell their client list, so that's one way in which they profited, and he knowingly profited. And then, of course, they tried to resell their business, including their client list, to Mr. Haney for, I think that was $450,000. And then, finally, it did end up selling their business to Mr. Awe. He still has it today. I don't remember the purchase price of that, but Mr. Morrison was the point person on all of these things. It was a mutually beneficial operation. He was benefiting just as much as Ms. Morrison was. And giving just the broad standard that applies to a substantive conviction under this and deference to the jury's verdict and to the evidence that supported that he was creating this and that he supported and aided and abetted the filing of these returns, I don't think there's a way that this court can vacate those convictions under the law. What evidence was there that he ever looked at any of these Schedule Cs? I don't recall any evidence that he looked at particular Schedule Cs that were filed. I just have, in terms of laying eyes on a Schedule C, Ms. Brown's returns because he created those Schedule Cs. And then we also have the intent evidence, which was 404B evidence, and those were his own tax returns with Ms. Morrison that they submitted to the IRS, and then he had a duplicate set of returns, but they had different numbers in them, that he submitted to his mortgage company, and that was to show that he understood this practice of inflating loss amounts to lower income because identical tax returns that were submitted to the IRS and the mortgage company had totally different income amounts by $100,000. I think it was over $100,000 because on the copy that was submitted to the IRS, and that was for the business return for JMA. So that was another Schedule C actually because they have their JMA return for their own selves. That was submitted to the IRS, had huge losses that resulted in, I think it was something like $26,000 in income they claimed for that year, whereas when they were trying to get their mortgage payments on a different schedule, they submitted returns to Wells Fargo that showed income over $100,000 because they didn't have those inflated loss amounts. They knew what they were doing. They did it together. Ms. Brown may have actually completed more of the returns that were charged as substantive counts, but that does not matter under the law. Just briefly, the only other issue that was mentioned in the previous discussion with the appellants was the Brady issue. That's a non-issue, total non-issue. I don't even recall the defense filing anything after trial about Brady, and they didn't even file a real Brady claim. They wanted us to stipulate to something. They filed something called a Brady document, but it wasn't that we weren't giving them evidence. It was that they wanted us to stipulate that with regard to transcripts of tax returns for the early 2000s for which the IRS doesn't keep whole returns, that when there was a Schedule C mentioned with a Y, that meant that the person had filed a Schedule C, even though we had no idea what was on the Schedule C, and the government stipulated to that during trial. But the government turned over every single tax return for all relevant years, 2000 to 2013, for each one of the tax repayers at issue. There were the transcripts for 2000 to 2004. There were limited 1040 forms plus the transcripts for 2005. There were complete returns for 2006 through 2013. Those were all turned over prior to trial, and as I mentioned in my brief, the defense even lists some of them on their exhibit list, and they entered into evidence some of the transcripts at trial. If the court has no further questions, I will yield my 15 seconds. Yes, thank you, Ms. Samuelson. Thank you. Mr. Knotzer, you've saved some time for rebuttal. I'd like to begin by discussing Ms. Morrison's testimony. First of all, the judge did not have to limit this. This was an arbitrary limitation. As opposing counsel mentioned, this was sui sponte as the trial was going on. This was not decided before trial. Moreover, if the judge was so concerned about time, there are other ways to limit the time of the defense without limiting the time . . . It seems to me it's arguable. I mean, I think the common practice is judges impose time limits before trial during the pretrial conference when they're going to impose those limits. Here, it's arguably more flexible because then you're having to see how the trial is going to go. Here, in the middle of trial, before you call the witness, he says, how much time are you going to need? Why isn't that actually a more favorable policy than the week before saying, here's what's going to govern this entire trial? I've never seen, even though I don't know what's going to happen. I believe asking counsel on the spot how much time they need, they may be caught up in their thoughts in the direct testimony and they won't have a well-reasoned answer. I believe it is more deferential to ask them in advance, so that way they can review their entire planned testimony and really consider that in a well-thought-out and reasoned approach. On the spot, I don't think there's enough time to really make that decision. Moreover, opposing counsel mentioned that there was no substance. It was difficult for multiple of Morrison's counsel to determine what she actually didn't get to testify on. As I mentioned earlier, she didn't get to testify on training. She didn't get to testify on the returns that she prepared personally. As Judge McBride interrupted her defense counsel and told him to sit down, she was actually testifying about the Schedule C amounts on the tax returns. And this is crucial to Counts 1 through 14, Your Honors. So I think this is very substantive. And moreover, she analogized to Mr. Morrison's testimony saying that he got 30 minutes and, therefore, Ms. Morrison's two hours was more than enough. However, I don't think that's an appropriate analogy. The witnesses, as Your Honors are quite aware, made very, very different claims to Mr. and Mrs. Morrison. Mr. Morrison was not implicated in the majority of the counts. However, Ms. Morrison was. And so she had more witnesses to meet, more testimony to refute, and based on that, the comparison between Mr. Morrison and Ms. Morrison's testimony is irrelevant. I'd like to move on now to discuss briefly on bias. I don't believe that this was an equal treatment of the prosecution and the defense, Your Honors. As I mentioned earlier, on Ms. Morrison's testimony, she was interrupted 23 times in two hours that never even approached that number with prosecution. Moreover, she mentioned that the judge assisted defense counsel by rewording the defense. However, that discredits the defense in the eyes of the jury. I'd like again to point, Your Honors, to Lyle v. Renico where the court made that finding. And last, not all of this was outside the jury, Your Honors. Thank you. Yes, sir. Mr. Talamantes, you've saved time for rebuttal. Thank you. May it please the court. Let me ask. You challenge all the counts on sufficiency grounds. Let's say we were to agree that there was some were insufficient but some were okay. That would obviously result in vacating the conviction and sentences on those particular counts. We found insufficient evidence. But what would you want us to do? How would that affect the sentences for the other counts given how lost calculations were? Do you get my question? Would that require vacating the sentences even on convictions we thought were sufficient? I think that there's two important points to that question. One is to note that counts 3 through 14, which includes 13 and 14 with Ms. Brown, which I discussed earlier, those are the overt acts of the conspiracy. So I think if those are vacated on insufficient evidence, that includes counts 1 through 15. So we're left with the wire fraud counts, which primarily had to do with various sales or franchise agreements for the business. I don't believe that the loss calculated to the IRS in counts 1 through 15 would be the same. So I believe that that would be the primary factor in determining the sentences. Judge Smith, to your point, opposing counsel would clarify Judge McBride's assistance to the government on count 15 as clarifying questions. If you look at record site 1653, he says, and I quote, I don't think you have the evidence of what bank made that transfer. And I quote, it's obvious that the H&R employee, Paul Hawkins, is talking about where the funds within H&R came from. And he clarified that further on recall, that he's talking about, well, we've got our fiduciary bank department. It's right across the street in Kansas City. It's obvious he's talking, Judge McBride says, it's obvious he's talking about where the funds within H&R originate, not what bank made the transfer. What bank made the transfer is the evidence necessary to establish interstate commerce. Thank you. All right, thank you, Ms. Talamantas. Your case is under submission.